Wanamaker, J.,
concurring. In the main I heartily concur in the opinion by Judge Johnson in support of the judgment of this court. There are, however, additional reasons that to my mind are not only pertinent but paramount in arriving at a just and sound conclusion in this case. These I shall briefly set forth in the following opinion:
“Municipalities shall have authority to exercise all powers of local self-government”—this is the cornerstone of home rule for Ohio cities. Section 3, Article XVIII, Ohio Constitution 1912.
Any farmer, workingman, business man, banker, physician, clergyman or any layman with average intelligence in English, understands the clear, *363 comprehensive and complete grant of power included in the above words. Some lawyers and judges seem to have serious doubt about it.
However, if these words stood alone the opposition reluctantly concede that their scope and dimensions would allow the city of Cleveland under its charter the' right and privilege of selecting its' own officers in its own way.
Certainly to the average mind “all powers” of local self-government means “all powers.” It is hard to realize that “all” may mean only “some,” “part,” “a fraction” or anything less than “all.” The words are so simple and so clear in the general grant that there is neither right nor occasion for doubt or interpretation.
The opposition to the city’s right under its charter so to select its own officers have abandoned all objections hitherto urged save that the general sweeping grant of power expressed in the words “municipalities shall have authority to exercise all powers of local self-government” is cut down by two qualifications or limitations in the constitution itself: First, the last half of Section 3, Article XVIII, which reads: “and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws;” and second, Section 7, Article V, “All nominations for elective state, district, county and municipal offices shall be made at .direct primary elections or by petition as provided by law,” etc.
Now to the first objection. In every municipality there are three kinds of governmental power now being exercised: federal, state and *364 municipal. The federal power of the nation is and of right ought to be supreme in its own proper jurisdiction. The state power of the state is and of right ought to be supreme in its own proper jurisdiction. Why should not the municipal power of the municipality be substantially supreme in its own proper jurisdiction? I contend that was the purpose of the constitution makers and adopters. Did they utterly fail in that purpose?
These powers are usually clearly distinguishable. At times, of course, between the state and the nation, as it is between the city and the state, there may be a twilight zone where it is difficult to distinguish into which class the governmental power falls. Nevertheless there is abundant reason and authority for such inherent distinction.
The federal power with its limitations was put in the federal charter, to-wit, the national constitution. The state power with its limitations in the federal charter and state charter was put into the state constitution. The municipal power is now to be put in the municipal charter, which is to be the constitution of the city, limited only by its own provisions and by the state and federal charters or constitutions.
The federal government has no right to exercise a state or a municipal power any more than a municipal government has a right to exercise a state or national power, unless the same shall be specially conferred by some constitutional grant or statutory enactment pursuant thereto.
The first half of Section 3, Article XVIII, known as the home-rule amendment, clearly refers to nothing but municipal powers when it says: *365 “Municipalities shall have authority to exercise all powers of local self-government.”
The last half of Section 3, Article XVIII, is as follows: “and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.” It is contended that this last half cuts down or subtracts from the grant of power in the first half.
Now if I understand the conjunction “and” it means addition, not subtraction. One of the first lessons of the child in simple arithmetic is put on the blackboard thus: 5 and 4 equal 9. Suppose the teacher taught the child that 5 and 4 equal 1, on the ground that “and” meant to cut down or subtract, how long would the teacher hold his job? And yet this theory is just as tenable as to say that the second half of Section 3 beginning with “and” cuts down or subtracts from the first half.
The first half relates wholly to municipal power. The last half relates wholly to state power. The first half is as unlimited as the second half is limited. The second half could not possibly relate to municipal power, because the first half is as comprehensive as a grant of power could be and therefore no addition could be made to it.
If it be claimed that “not in conflict with general laws” as. found in the second half modifies also the first half, then it must follow that all municipalities are as absolutely under the control and domination of the state legislature to-day as they were before the adoption of the home-rule amendment, because all general laws now on the statute books would be preserved, and future *366 legislatures might proceed with municipal legislation at their pleasure. Home rule would be but an empty ■ eggshell, a mere snare and ideality.
However, it is claimed that the matter of .providing how nominations shall be made in municipalities is the exercise of police power, and therefore the charter as to primaries and elections, being a local police regulation, must not conflict with general laws.
Some things, however, are admitted in this case. They have passed beyond the range of doubt or dispute: (1) That the municipality may under the home-rule amendment determine its own form of government; (2) it may determine its own officers; (3) it may determine their duties and powers; (4) it may determine whether they shall be appointed or elected; (S) it may determine the term of office, salary, etc.; (6) it may provide the right to recall such public officers. All minds meet upon these admissions as being within the scope and spirit of the home-rule amendment. If this be true, then certainly these powers are not within the police power of the state or else they too are subject to the general law as contended for by the opposition.
If these be not police powers, how can it be seriously and sensibly contended that the powers in question are police powers ? How do they differ in their first or last analysis?
If the city through its charter might determine ■the above matters for itself, it seems a sheer subterfuge to say that they may not determine how they shall nominate their own officers and how they shall elect their own officers.
*367 As a matter of fact, none of these powers are police powers either in common parlance or constitutional phrase, but instead they are merely political or governmental powers, elementary and primitive, because they must first be created and exercised before the municipality may perform any of its most important functions.
I am aware that some decisions are to the contrary, but no doctrine is so dubious, no assertion so absurd, but that some case may be found somewhere and somehow to support it.
The case much relied on to support this doctrine of police power as overruling the provision of the charter in question is the case of State, ex rel., v. Felton et al., 77 Ohio St., 554. The first section of the syllabus reads as follows: “The nomination of party candidates for public office concerns the public welfare and the legislature in the exercise of the police power may make reasonable regulations therefor;” The case in question involved an act of the legislature providing for primary elections by political parties, the contention being that such legislation was unconstitutional. The court sustained the legislation. That was under the constitution of 1851. It was the exercise of a state power in a state matter. The direct question was not before the court as to classifying the power exercised by the legislature, whether it was a purely governmental or political power, or whether, on the other hand, it was a police power. The court, however, has indicated its own view by designating it as a police power. I respectfully disagree with the opinion of the court in that case. Restraining or regulatory provisions touching *368 primary elections or general elections may be enacted to promote the public peace, or to prevent political fraud or to punish the offenders, but such would be merely incidental to the general act providing for primary elections.
Now as to the second and last objection that is seriously urged why . the charter is invalid, to-wit: Because it is in violation of Section 7, Article V, known as the direct primary amendment. I adopt the language of Judge Johnson in this behalf and add the following:
In interpreting any new amendment the well-known Blackstonian rule of construction must be applied: First, what was the old law; second, what were the mischiefs complained of; third, what remedy was intended to be provided under the new?
It is unnecessary here to repeat my views on home rule under this amendment as set forth in the Toledo home-rule case, decided May 6, 1913, State, ex rel. Toledo, v. Lynch, Auditor, ante, 125.
My view on the history of municipal government in Ohio is therein very fully set forth and I have no disposition to repeat it here, though much of it applies to the case at bar. Suffice it to say that home rule for cities and villages existed in Ohio before we had a state and existed in America before we had a nation.
The right of local self-government was recognized as an inherent, inalienable right by the fact of its general existence and the utter absence of any surrender of such right in the state constitution of 1802, which did not even name cities; villages or municipalities.
*369 ■ Every municipality was a law unto itself until .after the constitution of 1851, when the legislature assumed and usurped full and complete authority in governmental powers over municipalities, and that, too, without any sanction or grant express 'or implied in said constitution. This assumption of power, this usurpation of authority, was sanctioned by our courts by holding that municipalities have- only such power as is expressly conferred 'upon them by the state legislature; or such powers as are necessarily implied to carry -such express powers into effect. This was not only judge-made law but was judge-made constitution, without either authority of common sense, common law or constitution.
■ Now this resulted in government of cities by •the general assembly of Ohio, and the general •assembly was generally governed by the party boss or machine, with its allies of special privilege and .public franchise interests. By ripper and special legislation they could exploit the cities at their own pleasure; the local bosses in league with the state bosses held the citizens and taxpayers of the .city at their mercy.
To get rid of the state political bosses at Columbus who controlled the legislature, to get rid of the party bosses at home, the citizenship long demanded the right of • nonpartisan nomination, election and public service in their own city governments.
They had already successfully accomplished this in the nomination and election of members of the school board. They had already accomplished the nonpartisan election of all their judges. They had *370 already successfully accomplished the nonpartisan ■nomination and election of delegates to the constitutional convention. They had already successfully acquired the right of nonpartisan nomination and election of charter commissioners. Now the people wanted to nominate and elect their own municipal officers, with reference to their personal fitness, their business qualifications and their experience in the public service, equipping them for the respective municipal offices. The people believed that, the qualifications for successful service in public corporations were practically identical with qualifications for successful service in the private corporations.
They believed they had been duped long enough by the stratagems and spoils of the boss. The party lash had been employed and cracked long enough by these patriotic, high-minded bosses demanding, that the local candidate for mayor or councilman on the Republican ticket, or the Democratic ticket, be elected for the “grand old party’s sake;” that the party’s salvation no less than the nation’s salvation depended upon the election of a Republican or a Democratic mayor or councilman.
Party labels and party emblems had become ridiculous in local affairs and the people had grown tired of voting for mere party birds, whether eagles or roosters, and they wanted a chance to vote their beliefs by voting for candidates solely for personal fitness for local reasons and conditions, with a view of getting the most equitable, economic and efficient public service.
• What matters what the candidate’s views on the Philippines, the Panama canal, the tariff or the *371 currency system? The test should be: What does he know about the needs of the city and its problems, its law and order, its public health, its highest and most general welfare, and what is his capacity, his common sense, and his courage to give expression to the best public will and judgment in this behalf?
Accordingly the people demanded of the constitutional convention: (1) Emancipation from legislative domination and dependence; (2) emancipation from state and party bosses; (3) nonpartisanship in all purely municipal matters.
That is what they asked for and that is what the constitutional convention evidently tried to give them. Shall they now be deprived of this long-struggled-for freedom from blind and corrupt partisanship by the judgment of this court?
Having now discussed the primary and paramount purposes of this new home-rule amendment, let us see whether after all there is any conflict between the terms and provisions of the primary amendment and the home-rule amendment.
The part of the primary amendment in question reads as follows: “Section 7, Article V. All nominations for elective state, district, county and municipal offices shall be made at direct primary elections or by petition as provided by law.” Now the Cleveland charter makes all its nominations by petition, which enables them to be free from party domination, free from boss control, by cutting out of its charter party primaries. Of course, this freedom from party domination will not be accomplished in a day; but the people are at least provided with the tools to effect it by and by.
*372 The layman reading this language would at once say that either one of two methods for making nomination of municipal officers was here authorized when so provided by law: the one, direct primaries, the other, by nominating petitions; but that it was for a law duly enacted after the passage of this amendment to determine which method should be adopted and the necessary •legislative regulations therefor.
Manifestly this provision of the constitutional amendment is not self-executing. Legislation in some form is needed. Suppose the legislature were to make no provision whatsoever for primary elections, but did provide for all nominations by petition for state, county, district and other offices. Does any one seriously doubt that under this amendment such legislation would be constitutional ?
The purpose of this amendment was to abolish the old packed caucus and boss-controlled convention and give the people equal chance to voté by ballot for the various candidates for nomination, and that by either route, primary or petition, as the law should provide.
The opposition, however, contend here that “or” ■should be read “and.” They are right, in order to carry out the construction of this amendment they claim for it. But what right, pray, has any court to read “or” as “and?” It is presuming a good deal to say that the constitutional convention did not know that “or” is always used in the alternative and “and” in the conjunctive. If they had meant “and” I think it may fairly be presumed that they were intelligent enough to have used *373 “and,” and of course if “and” had been used the claims of the opposition could be more favorably considered.
Cases have been cited in which the courts have held “or” the equivalent of “and.” But this would be judicial legislation of the most aggravated character, and would arouse the deserved contempt of our independent and intelligent citizenship.
It is claimed that “as provided by law” means state law; general-assembly law only.
Inasmuch, however, as the purpose of the home-rule amendment was clearly and certainly to make the charter the supreme law of the city as- to municipal matters, therefore it must follow that the charter is a law for the city quite as much as an act of the general assembly is a law for the state.
Judge Johnson has very fully handled this question in his opinion and cites the big fact that the supreme courts of all the states that have adopted the home-rule provisions by charters have held the provisions of the charter quite as much within the words “provided by law” as any act of the state legislature.
One more analogy that seems to me conclusive on the questions at issue.
Section 2 of the home-rule amendment, Article XVIII, .reads as follows: “General laws shall be passed to provide for the incorporation and government of cities and villages,” etc.
Section 7, Article V, as to primary elections, reads as follows: “All nominations for elective state, district, county and municipal offices shall be made at direct primary elections or by petition, as provided by law,” etc.
*374 All concede that the adoption of a charter by a city withdraws thát city from the “general laws” for the “government of cities and villages” provided for in said Section 2. If it be not so the general laws could at any time nullify the charter and home rule would be only a pretty platitude.
If the force of the charter ipso facto withdraws the city from the general law as to “government,” how can it be said that that same charter does not withdraw the city from each fractional part of government, such as a primary nomination or election ?
The language of Section 2 is much more comprehensive than the language of said Section 7. If the whole be greater than any of its parts then when we have the withdrawal from the whole of government it must likewise follow that there is a withdrawal from each and every one of its parts.
Boiled down, what possible interest could the state have in the method by which the city should nominate and elect its own officers, officers that have nothing to do with anything but purely municipal affairs? Who, outside the city, could have any interest in or objection to such plan but the political boss and his allies?
The will of the dead man controls the disposition of'his property. The will of living men should control the disposition of their power as expressed through their constitution. The will of the constitution makers as to the home-rule amendment is quite apparent and familiar to all our people.
It is high time to construe our constitutions in the interests of a people’s government instead of a party government. It is time that the declara *375 tion: “All political power is inherent in the people” be made good. It is time that the constitution be interpreted to shield the people’s power and the people’s property rather than to exploit them for the benefit of the political boss and the party machine. The people of a city cannot get real efficiency in the public business until they get real emancipation from the'party boss.